Susheel Kirpalani (Pro Hac Vice pending)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: susheelkirpalani@quinnemanuel.com

K. John Shaffer (Cal. Bar No. 153729)
Matthew R. Scheck (Cal. Bar. No. 273152)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
Email: johnshaffer@quinnemanuel.com
       matthewscheck@quinnemanuel.com

Stephen Finestone (Cal. Bar. No. 125675)
Jennifer C. Hayes (Cal. Bar. No. 197252)
FINESTONE HAYES LLP
456 Montgomery Street, 20th Floor
San Francisco, California 94104
Telephone: (415) 616-0466
Facsimile: (415) 398-2820
Email: sfinestone@fhlawllp.com
       jhayes@fhlawllp.com

*Attorneys for the ResCap Liquidating Trust*

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>HOME LOAN CENTER, INC.,<br><br>Debtor. | Case No. 19-51455 (MEH)<br><br>Chapter 11<br><br>**MOTION TO CONVERT CASE TO CHAPTER 7**<br><br>Date: August 29, 2019<br>Time: 10:30 a.m.<br>Place: Courtroom 11<br>        280 South First Street<br>        San Jose, CA 95113<br>Judge: Hon. M. Elaine Hammond |

# TABLE OF CONTENTS

                                                                                                              Page

PRELIMINARY STATEMENT ................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................4

STATEMENT OF FACTS .....................................................................................................4

    A.    The Debtor ..............................................................................................................4

    B.    ResCap's Litigation And Judgment Against HLC ...................................................4

    C.    HLC's Fraudulent Transfer To LendingTree ..........................................................6

    D.    HLC's Bankruptcy ...................................................................................................7

ARGUMENT ..........................................................................................................................8

    A.    This Case Should Be Converted For Cause Under Bankruptcy Code Section
           1112(b) ...................................................................................................................8

          1.    Cause Exists Because There Is A Substantial And Continuing
                Diminution Of The Estate And No Reasonable Likelihood of
                Rehabilitation Under Section 1112(b)(4)(A) .............................................9

          2.    Cause Also Exists Because An Independent Fiduciary Is Needed To
                Pursue Estate Claims Against Insiders .......................................................12

          3.    Cause Also Exists Because HLC's Chapter 11 Filing Is Not In Good
                Faith .........................................................................................................18

          4.    Cause Also Exists Because Creditors Support Conversion .........................19

    B.    There Are No Unusual Circumstances That Support Denial Of Conversion...........19

    C.    Conversion Is In The Best Interests Of Creditors ...................................................20

CONCLUSION .....................................................................................................................20

MOTION TO CONVERT CASE TO CHAPTER 7

# **TABLE OF AUTHORITIES**

**Page**

**Cases**

*In re Adelphia Commc'ns Corp.*,
336 B.R. 610 (Bankr. S.D.N.Y. 2006) ................................................................. 13

*In re Babayoff*,
445 B.R. 64 (Bankr. E.D.N.Y. 2011) .................................................................. 20

*In re BH S&B Holdings, LLC*,
439 B.R. 342 (Bankr. S.D.N.Y. 2010) ................................................................ 11

*In re Euro-American Lodging Corp.*,
365 B.R. 421 (Bankr. S.D.N.Y. 2007) ................................................................ 14

*In re Granite Partners, L.P.*,
219 B.R. 22 (Bankr. S.D.N.Y. 1998) ............................................................. 13, 14

*In re Green*,
2016 WL 6699311 (B.A.P. 9th Cir. Nov. 9, 2016) ........................................... 9, 20

*In re Intercat Inc.*,
247 B.R. 911 (Bankr. S.D. Ga. 2000) ................................................................. 12

*In re Ira Haupt & Co.*,
361 F.2d 164 (2d Cir. 1966) ............................................................................... 13

*Law v. Siegel*,
571 U.S. 415 (2014) ........................................................................................... 13

*In re Lennon*,
2005 WL 6771262 (B.A.P. 9th Cir. July 20, 2005) ............................. 10, 11, 12, 20

*Loop Corp. v. U.S. Tr.*,
379 F.3d 511 (8th Cir. 2004) ...................................................................... 9, 10, 11

*Marsch v. Marsch (In re Marsch)*,
36 F.3d 825 (9th Cir. 1994) ............................................................................... 18

*In re Marvel Entm't Grp.*,
140 F.3d 463 (3d Cir. 1998) ............................................................................... 15

*In re McClure*,
2016 WL 3769094 (Bankr. C.D. Cal. July 12, 2016) .......................................... 19

*In re Menk*,
241 B.R. 896 (B.A.P. 9th Cir. 1999) .................................................................. 13

*In re Mense*,
509 B.R. 269 (Bankr. C.D. Cal. 2014) ............................................................ 9, 10

*In re Microwave Prods. of Am.*,
102 B.R. 666 (Bankr. W.D. Tenn. 1989) ............................................................ 15

Case: 19-51455    Doc# 41    Filed: 07/31/19    Entered: 07/31/19 18:46:26    Page 3 of 26

*In re Mid Pac. Airlines, Inc.*,
110 B.R. 489 (Bankr. D. Haw. 1990) ................................................................ 14

*In re Phoenix Piccadilly, Ltd.*,
849 F.2d 1393 (11th Cir. 1988) ......................................................................... 18

*In re Picacho Hills Util. Co., Inc.*,
518 B.R. 75 (Bankr. D.N.M. 2014) ............................................................ 11, 12

*In re Red Door Lounge, Inc.*,
559 B.R. 728 (Bankr. D. Mont. 2016) ............................................................... 11

*In re Residential Capital, LLC*,
2013 WL 12161584 (Bankr. S.D.N.Y. Dec. 11, 2013) ........................................ 5

*In re Residential Capital, LLC*,
497 B.R. 720 (Bankr. S.D.N.Y. 2013) ............................................................... 16

*Residential Funding Co., LLC v. Universal Am. Mortg. Co., LLC*,
2018 WL 4955237 (D. Minn. Oct. 12, 2018) ................................................... 10

*In re Rey*,
2006 WL 2457435 (Bankr. N.D. Ill. Aug. 21, 2006) ........................................ 20

*In re RFC & ResCap Liquidating Trust Action*,
2015 WL 3915749 (D. Minn. June 25, 2015) ..................................................... 6

*In re RFC & ResCap Liquidating Trust Action*,
2019 WL 2448155 (D. Minn. June 12, 2019) ..................................................... 6

*In re RFC & ResCap Liquidating Trust Action*,
332 F. Supp. 3d 1101 (D. Minn. 2018) ......................................................... 4, 5

*In re SONICblue, Inc.*,
422 B.R. 204 (Bankr. N.D. Cal. 2009) .............................................................. 15

*In re Stratesec, Inc.*,
324 B.R. 158 (Bankr. D.D.C. 2004) ................................................................. 13

*In re Sunbum5 Enters., LLC*,
2011 WL 4529648 (M.D. Fla. Sept. 30, 2011) ........................................... 13, 14

*In re Suncruz Casinos, LLC*,
298 B.R 821 (Bankr. S.D. Fla. 2003) ............................................................... 12

*In re Univ. Commons, L.P.*,
204 B.R. 80 (Bankr. M.D. Fla. 1996) ............................................................... 18

*In re USA Commercial Mortg. Co.*,
452 F. App'x 715 (9th Cir. 2011) ....................................................................... 9

*In re V. Savino Oil & Heating Co., Inc.*,
99 B.R. 518 (Bankr. E.D.N.Y. 1989) ................................................................ 15

MOTION TO CONVERT CASE TO CHAPTER 7

# Statutory Authorities

11 U.S.C. § 102(3) ................................................................................................ 12

11 U.S.C. §§ 321–323 .......................................................................................... 12

11 U.S.C. § 326 .................................................................................................... 12

11 U.S.C. § 327 .................................................................................................... 12

11 U.S.C. § 362 ...................................................................................................... 4

11 U.S.C. §§ 701–704 .......................................................................................... 12

11 U.S.C. § 1104 .................................................................................... 12, 13, 16

11 U.S.C. § 1104(a) ................................................................................. 9, 15, 17

11 U.S.C. § 1106 .................................................................................................. 12

11 U.S.C. § 1107 ........................................................................................... 12, 13

11 U.S.C. § 1112 ............................................................................................ *passim*

# Rules and Regulations

Fed. R. Bankr. P. 9019 .................................................................................. 14, 17

# Additional Authorities

7 Collier on Bankruptcy, ¶ 1112.04[2] (15th Ed. Rev. 2000) ............................ 10

7 Collier on Bankruptcy, ¶ 1112.04[4], [6] (16th Ed. Rev. 2018) ....................... 9

H. Rep. No. 95-595 (1977), *U.S. Code Cong. & Admin. News* (1978) ............... 13

Jay R. Indyke et al., *Are The Foxes Guarding The Henhouse?*, TURNAROUND
    MANAGEMENT ASSOCIATION (June 2019) ............................................... 16, 17

iv

MOTION TO CONVERT CASE TO CHAPTER 7

ResCap Liquidating Trust ("ResCap"), as successor in interest to Residential Funding Company ("RFC"), moves to convert this case to a chapter 7 case, pursuant to 11 U.S.C. § 1112(b). The debtor, Home Loan Center ("HLC"), has no business operations, and its principal assets are cash and at least $40 million of claims against insiders. HLC does not belong in chapter 11. Liquidation of the estate in chapter 7 would be far more appropriate because it would be under the auspices of an independent trustee selected by the United States Trustee in accordance with the Bankruptcy Code. This Motion is supported by Lehman Brothers Holdings, Inc. and ResCap, which together hold over 95% of the scheduled claim amounts in this case.

### PRELIMINARY STATEMENT

This chapter 11 case is nothing more than an expensive scheme to frustrate creditors of a defunct mortgage originator. This scheme has been orchestrated by HLC's corporate parent (LendingTree, LLC) and chairman (Douglas Lebda). Together, LendingTree and Mr. Lebda siphoned at least $40 million out of the debtor, and caused HLC to spend millions more on professionals, all in an effort to delay paying creditors for as long as possible. Undoubtedly, LendingTree hopes that creditors will want to avoid the estate's resources being consumed by professionals hand-picked by LendingTree, and thus will agree to settle for pennies-on-the-dollar to end the case early.

Meanwhile, LendingTree has been reaping in substantial profits, with its stock rising more than 400% on the NASDAQ since it raided HLC's cash and left HLC insolvent, and Mr. Lebda receiving more than $100 million in compensation.[1] As LendingTree was breaking ground last week on new towers for its headquarters in North Carolina,[2] it was simultaneously putting HLC – one of its own subsidiaries – into bankruptcy here in California.

---

[1] *See* The Charlotte Observer, May 7, 2019, *LendingTree CEO Gets Another Big Pay Day — Making Him Among The Top-Paid U.S. Execs* (available at https://www.charlotteobserver.com/news/business/banking/article229986424.html).

[2] *See* The Charlotte Observer, July 25, 2019, *Construction Underway On LendingTree HQ In South End, Part Of A $300 Million Complex* (available at https://www.charlotteobserver.com/news/business/biz-columns-blogs/development/article233104737.html).

HLC is a shell company with no business to rehabilitate, no operations to reorganize, and no balance sheet to restructure. It sold its operating business assets in 2012, and its principal activity since then has been disputing claims brought by ResCap and other creditors on account of HLC's shoddy lending practices. HLC made numerous false representations and warranties to RFC, as determined last November by a jury verdict in the United States District Court for the District of Minnesota. As a result of HLC's pervasive breaches, the District Court entered judgment against HLC for more than $68 million.

HLC claims that it cannot afford to bond ResCap's judgment on appeal. Yet, by HLC's own admission, it transferred at least $40 million to LendingTree while ResCap's lawsuit was pending, and long after HLC's business operations had ceased. Moreover, despite pleading poverty, HLC has employed an astounding number of professionals in connection with this bankruptcy, including at least four large law firms, three financial advisory firms, two accounting firms, an "independent director," and a "Chief Restructuring Officer" ("CRO"). HLC has paid these professionals nearly $5 million during the 90 days before bankruptcy (and undoubtedly more before then), and HLC will be seeking approval of more than $1.7 million in retainers. And while HLC's employment of professionals may have been a boon to the local economy, HLC's professionals are in fact the only connection HLC has to this District (beyond HLC's state of incorporation). HLC's nerve center has been Charlotte, North Carolina for nearly a decade, perhaps explaining HLC's defensive unsolicited "statement in support" of venue (Dkt. No. 7).[3]

The stated purpose for having so many bankruptcy professionals is for HLC to "investigate" and attempt to settle its spurious dealings with insiders. These fiduciary claims are, by HLC's own admission, its most significant assets – fraudulent transfer, illegal dividend, and breach of duty claims against its non-bankrupt, publicly traded parent, LendingTree, and its chairman Mr. Lebda, who until just a few months ago was the sole director of HLC. But this investigation was conceived by its very targets. HLC's reorganization counsel and CRO's firm were hired more than a year ago,

---

[3]     Even the choice of this division is an odd one. HLC lists a mailing address in San Mateo County. HLC's sole director has his office in San Francisco, and its Chief Restructuring Officer is located in Contra Costa County.

when LendingTree and Mr. Lebda were solely in charge, and HLC's "independent" director was hand-picked by LendingTree. Thus, no matter how qualified HLC's current management and professionals may be, the inescapable fact is that they are carrying out a scheme designed by the very targets of the investigation.

HLC's only other scheduled assets are (i) about $5.4 million in cash, half of the amount of cash HLC apparently had just 90 days ago, (ii) interests in a non-operating subsidiary, HLC Escrow, which has another $490,000 in cash, and (iii) tax attributes, whose value is, at best, a small fraction of the amounts already paid to HLC's professionals in preparation for this chapter 11 case. HLC has no inventory, other real or personal property, or employees. HLC's only creditors of any significance are ResCap and other financial institutions (including Lehman) to whom HLC made, or is alleged to have made, false representations and warranties.

This is not an appropriate use of chapter 11. There is no business to reorganize (or even liquidate), nor any operating assets to sell. Rather, all that is in the estate are claims against insiders, cash, and some tax attributes whose value (if any) will be exceeded by just a few weeks of administrative expenses. This case is far more appropriate for chapter 7, in which an independent trustee can investigate and pursue insiders, and which will avoid the significant additional expenses and complexity of chapter 11.

ResCap does not doubt that some of HLC's professionals may have expended considerable time and effort in connection with this case – indeed, the amounts HLC has already paid them suggest as much. But whether those services are of value to the estate and its creditors – rather than to serve the interests of LendingTree and its chairman – is best determined by an independent fiduciary appointed by the United States Trustee. Conversion to chapter 7 will conserve resources, serve the interests of creditors, and ensure that the estate's claims against insiders are properly investigated and pursued.

Allowing HLC to remain in chapter 11, by contrast, would be grossly unfair to creditors, and would set a bad precedent for future cases dominated by insider claims. A highly profitable, NASDAQ-traded company cannot take $40 million from its subsidiary, bankrupt it, and then try to make the entire affair go away through an investigation by the very people it selected. Conversion

MOTION TO CONVERT CASE TO CHAPTER 7

of this case, and the appointment of a chapter 7 trustee, is the only way to ensure the fair treatment of creditors and the preservation of the integrity of the bankruptcy process.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**STATEMENT OF FACTS**

### A.     The Debtor

HLC is a wholly-owned subsidiary of LendingTree LLC, which in turn is a wholly-owned subsidiary of LendingTree, Inc. (together with LendingTree LLC, "LendingTree"). English Decl. ¶ 3.[4]  Prior to 2012, HLC was in the business of originating mortgage loans and selling them to "investors" including RFC. *Id.* ¶¶ 5–6.  In June 2012, HLC consummated a sale of substantially all of its operating assets to Discover Bank for approximately $55.9 million. *Id.* ¶ 7.

HLC has not conducted any new business since 2012.  Rather, it has been "winding down" its operations.  Most of this wind-down was completed years ago – by the beginning of 2015 – when LendingTree stated in an SEC filing that "wind-down activities have included, among other things, selling the balance of loans held for sale to investors, paying off and then terminating the warehouse lines of credit and settling derivative obligations, *all of which have been completed*."  *See* LendingTree Form 10-K filed March 16, 2015, at 63 (emphasis added).[5]  Since that time, HLC's principal activities have been disputing more than $100 million in claims asserted against it on account of defective mortgages that it originated and sold to RFC and other investors.  *See* English Decl. ¶¶ 12–20.

### B.     ResCap's Litigation And Judgment Against HLC

RFC was in the business of acquiring and securitizing residential mortgage loans. *Id.* ¶ 15.  RFC's business model was built on acquiring loans from "correspondent lenders," such as HLC, and distributing those loans by either pooling them together with other similar mortgage loans to sell into residential mortgage-backed securitization ("RMBS") trusts, or selling them to whole loan

---

[4]    *See* Declaration Of Matthew English In Support Of The Debtor's Motion For Relief From The Automatic Stay Under 11 U.S.C. § 362 To Prosecute Appeal Of Adverse Judgment ("English Decl."), Dkt. No. 19.

[5]    *See  https://www.sec.gov/Archives/edgar/data/1434621/000143462115000011/tree-12312014x10k.htm.*

purchasers. *See In re RFC & ResCap Liquidating Trust Action*, 332 F. Supp. 3d 1101, 1118 (D. Minn. 2018).

HLC and other mortgage originators made numerous representations and warranties to RFC regarding the quality of the loans they originated and sold to RFC. *Id.* at 1120. RFC, in turn, relied upon these representations in reselling the loans into RMBS securitizations. *Id.* As the real estate market began to soften, however, an increasing number of loans went into default, and RFC faced billions of dollars in claims for having securitized the defective mortgages. *Id.* at 1117, 1122–24.

RFC and various of its affiliates filed chapter 11 petitions in the United States Bankruptcy Court for the Southern District of New York on May 14, 2012 (Case No. 12-12019, Hon. Martin Glenn). *Id.* at 1123–24. Unlike HLC, however, RFC had operating assets to be administered in a chapter 11, including operating a large mortgage servicing business that ultimately was sold as a going concern for $3 billion following a bankruptcy auction process. *See In re Residential Capital, LLC*, 2013 WL 12161584, at *12 (Bankr. S.D.N.Y. Dec. 11, 2013).

RFC confirmed its plan of reorganization on December 11, 2013 ("RFC Plan"). *Id.* The RFC Plan included settlements of all RMBS-related claims against RFC, resulting in more than $7 billion in allowed claims against it. The RFC Plan also provided for ResCap's creation in order to administer the estate's remaining assets for the benefit of RFC's creditors. *Id.* at *19–21. Those assets included indemnity claims against HLC and other mortgage originators who sold defective loans to RFC. *Id.* at *32. HLC and the other breaching originators were obligated to indemnify RFC for their share of RFC's RMBS-related liabilities to its creditors. *See In re RFC & ResCap Liquidating Trust Action*, 332 F. Supp. 3d at 1101, 1121–22.

ResCap has resolved the vast majority of these claims through settlements. Indeed, ResCap has settled with every originator who sold loans to RFC, except HLC and one other company that is also represented by HLC's litigation counsel, Williams & Connolly.[6] HLC did not settle, and instead chose to litigate for years, including a jury trial that it lost.

---

[6] ResCap also is pursuing fraudulent transfer and related claims against certain parties in other pending matters.

MOTION TO CONVERT CASE TO CHAPTER 7

ResCap sued HLC in Minnesota state court on December 16, 2013. *See* English Decl. ¶ 18 (citing *Residential Funding Co., Inc. v. Home Loan Ctr.*, Case No. 27-CV-14-3609 (Minn. Dist. Ct.)). The case was eventually removed to the U.S. District Court for the District of Minnesota (Case No. 14-cv-01716), where it was consolidated for pre-trial purposes with other actions that ResCap had brought (Case No. 13-cv-03451). *Id.*

The case went to trial on October 15, 2018. As described by the presiding judge, the Honorable Susan Nelson, "[t]he jury heard the testimony of 29 witnesses (some live, others videotaped), including seven experts, and received over 75 exhibits." *In re RFC & ResCap Liquidating Trust Action*, 2019 WL 2448155, at *1 (D. Minn. June 12, 2019). The trial lasted three weeks, but the jury only took two-and-a-half hours to find HLC liable. *Id.*

On November 8, 2018, a jury awarded ResCap $28.7 million in damages on account of HLC's breaches of representations and warranties. *Id.*; *see also* English Decl. ¶ 19 (citing Case No. 13-cv-03451 (D. Minn.), Dkt. No. 4705). On June 21, 2019, the District Court entered judgment against HLC for $68,484,502.06, including statutory pre-judgment and post-judgment interest, and contractual attorneys' fees. English Decl. ¶ 19 (citing Case No. 14-cv-01716, Dkt. No. 83). HLC has appealed to the Eighth Circuit, and HLC was required to post a bond to stay enforcement by no later than July 22, 2019, but the appeal was stayed by the commencement of this chapter 11 case on July 21, 2019.

### C. HLC's Fraudulent Transfer To LendingTree

In January 2016, HLC paid a $40 million "special dividend" to LendingTree. English Decl. ¶ 9. The dividend was authorized by HLC's board of directors, which consisted of a single director – LendingTree's chairman. *Id.* ¶¶ 3, 9. The dividend was not from HLC's operating income, as HLC had sold its operating assets more than three years earlier. *Id.* ¶ 7.

At the time the dividend was made, ResCap's action against HLC had been pending for more than two years, discovery was ongoing, and the court had denied HLC's motion to dismiss. *See In re RFC & ResCap Liquidating Trust Action*, 2015 WL 3915749 (D. Minn. June 25, 2015). Moreover, Lehman Brothers' bankruptcy estate also had made an indemnification demand against

HLC,[7] which was followed by the filing of a complaint seeking $40.2 million in damages just days after the dividend. English Decl. ¶ 12. HLC also was facing potential claims from other financial institutions, which HLC now estimates are in the range of $4.3 million to $7.9 million for GAAP purposes. *Id.* ¶ 14. Yet, by upstreaming $40 million to LendingTree as a dividend, HLC was left with no means to satisfy these claims. By its own admission, HLC now lacks sufficient assets even to post a bond, let alone pay its creditors. *Id.* ¶ 21. HLC has, however, continued to pay millions of dollars to professionals, even after judgment was entered against it in Minnesota.

### D. HLC's Bankruptcy

LendingTree, Mr. Lebda, and HLC have been planning this bankruptcy case for at least a year. The Statement of Financial Affairs ("SOFA") shows that both reorganization counsel (Pachulski Stang Ziehl & Jones LLP ("Pachulski")) and the firm at which the CRO, Mr. English, is a Senior Managing Director (Arch & Beam Global, LLC ("Arch & Beam")) have been working since July 2018, and possibly longer (since the SOFA only requires one year of disclosure). *See* Dkt. No. 16 at 71–75. During that time, Pachulski has received nearly $1 million in payments, while Arch & Beam has received over $700,000. Development Specialists, Inc. ("DSI") has received another nearly $200,000. *Id.* at 76–77. Indeed, HLC has paid nearly $5 million to professionals in just the last 90 days. *Id.* at 58–66. The SOFA identifies ***nine*** different professionals receiving payments during the last 90 days, including four law firms, three financial advisors, and two accounting firms. *Id.* Eight of these firms have received in total more than $1.7 million in retainers. *Id.* at 12–13.

While HLC and its insiders and professionals clearly have been focused on this bankruptcy, they have completely excluded their creditors from this process. ResCap was never consulted about, or even informed of, the fact that HLC was conducting an "investigation" of insider claims and "settlement negotiations" of those claims. Indeed, the first time ResCap heard about any of this was when HLC filed its notice of bankruptcy in the District Court just days ago.

---

[7] *See* LendingTree 10-Q filed Nov. 26, 2015 at 16. https://www.sec.gov/Archives/edgar/data/1434621/000143462115000040/tree-2015930x10q.htm

Case: 19-51455    Doc# 41    Filed: 07/31/19    Entered: 07/31/19 18:46:26    Page 12 of 26

HLC asserts that there are three reasons for this bankruptcy case: (1) to avoid having to post a bond while appealing ResCap's judgment, (2) to liquidate other claims against the estate, and (3) "to monetize the claims against [LendingTree and Mr. Lebda] through settlement or litigation." English Decl. ¶¶ 21–22. HLC does not even pretend that there is a reorganization to be had, as there is no operating business, or even assets to sell. Indeed, both Mr. English's Declaration and the Schedules show that the estate has no assets except cash (held directly by HLC or through a non-operating subsidiary), claims against insiders, and tax attributes. *See* English Decl. ¶¶ 8–9; Schedules, Dkt. No. 16 at 12–15.

According to HLC's recently filed stay relief motion:

> The Debtor, through its Independent Manager and CRO, has spent substantial time and resources analyzing the Debtor's claims [against LendingTree and its chairman]. In addition to restructuring counsel, the Debtor retained FTI Consulting, Inc.[8], and Katten Muchin Rosenman LLP to assist the Debtor in connection with such analysis.

Dkt. No. 17 at 4.

ResCap does not doubt that "substantial time and resources" have been spent on this investigation – the millions of dollars in professional fees already paid illustrates that. But the Independent Manager and CRO were both hired by LendingTree, and thus under HLC's construct, LendingTree has been able to hand-select the very same "independent" parties who are supposed to be investigating it. Equally troubling is HLC's admission that "settlement negotiations are ongoing." *Id.* In other words, HLC is already carrying out LendingTree's plan to be "investigated" by, and negotiate a deal with, the same people it hand-picked and employed.

## ARGUMENT

### A.     This Case Should Be Converted For Cause Under Bankruptcy Code Section 1112(b)

Bankruptcy Code section 1112(b)(1) provides that the court shall "convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best

---

8       FTI Consulting had been retained by both RFC and ResCap to analyze, among other things, RFC's potential exposure on RMBS-related representation and warranty claims. These are the same claims that underlie ResCap's judgment against HLC. ResCap is very concerned that FTI has accepted this engagement under these circumstances, and it reserves all rights.

interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1). "If cause is established and unusual circumstances are not found by the Court, the statute *requires* conversion to chapter 7 or dismissal of the case . . . ." 7 *Collier on Bankruptcy* ¶ 1112.04[4] (16th Ed. Rev. 2018) (emphasis added). Cause need only be established by a preponderance of the evidence, at which point the burden shifts to the debtor to prove that "unusual circumstances" exist. *In re Green*, 2016 WL 6699311, at *8, *10–11 (B.A.P. 9th Cir. Nov. 9, 2016).

      **1.**      **Cause Exists Because There Is A Substantial And Continuing Diminution Of The Estate And No Reasonable Likelihood of Rehabilitation Under Section 1112(b)(4)(A)**

A chapter 11 case shall be converted or dismissed for cause if there is "a substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 USC § 1112(b)(4)(A). Those circumstances are present here.

As to the first element, "[a]ll that need to be found is that the estate has suffered some diminution in value." *In re Mense*, 509 B.R. 269, 284 (Bankr. C.D. Cal. 2014). "'[A] negative cash flow situation alone is sufficient to establish continuing loss to or diminution of the estate.'" *In re USA Commercial Mortg. Co.*, 452 F. App'x 715, 724 (9th Cir. 2011) (quoting *Loop Corp. v. U.S. Tr.*, 379 F.3d 511, 515–16 (8th Cir. 2004)). "In the context of a debtor who has ceased business operations and liquidated virtually all of its assets, any negative cash flow—including that resulting only from administrative expenses—effectively comes straight from the pockets of the creditors." *Mense*, 509 B.R. at 284; *see also* 7 *Collier on Bankruptcy* ¶ 1112.04[6][a][i] (same).

Here, HLC is improperly attempting to force its creditors to pay for a bloated chapter 11 process, when it has no business operations or assets other than cash and causes of action against the same insiders who set this process in motion. In just the last 90 days, HLC has burned through $5 million – nearly half of its cash – paying no less than nine professionals. In return, HLC has imposed upon its creditors an "investigation" of HLC's insiders, about which the creditors were never consulted or even informed. In addition, HLC has engaged in "settlement negotiations" with those insiders, in which creditors have played no role whatsoever. Meanwhile, ResCap is being forced to "fund[] the appeal against itself . . . while [HLC] avoids the requirement of an appeal

Case: 19-51455   Doc# 41   Filed: 07/31/19   Entered: 07/31/19 18:46:26   Page 14 of 26

bond." *Mense*, 509 B.R. at 284.  ResCap and HLC's other creditors should not also have to fund the unnecessary and inappropriate additional costs of a chapter 11 case where none is necessary.  *See id.* at 285 (finding cause under section 1112(b)(4)(A) because the cash in the estate was dissipating due in part to administrative expenses of a chapter 11).

HLC's needless professional spending spree is further illustrated by its recently-filed stay relief motion to proceed with its Eighth Circuit appeal (Dkt. No. 17).  HLC did not even approach ResCap to inquire about whether ResCap would consent to relief from the stay before preparing a twenty-page brief and two lengthy declarations (Dkt. Nos. 19, 20), including one in which HLC's litigation counsel repeats as purported "facts" the same baseless arguments HLC made to the District Court, many of which also were rejected by other Federal District Judges in Minnesota in related matters.  *See, e.g.*, *Residential Funding Co., LLC v. Universal Am. Mortgage Co., LLC*, 2018 WL 4955237 (D. Minn. Oct. 12, 2018) (Magnuson, J.).[9]

Moreover, HLC is liquidating, and there is no chance for HLC's rehabilitation.  *See Loop*, 379 F.3d at 516.  Indeed, this case is barely a liquidation, since the only material assets are cash that has already been liquidated and insider claims.  As such, there is no justification for the expense of a chapter 11 process.  "'In order to avoid the costs of chapter 11 in cases in which they are not justified, section 1112(b) was designed to provide the court with a powerful tool to weed out inappropriate chapter 11 cases at the earliest possible stage.'"  *In re Lennon*, 2005 WL 6771262, at *4 (B.A.P. 9th Cir. July 20, 2005) (quoting 7 *Collier on Bankruptcy* ¶ 1112.04[2] (15th Ed. Rev. 2000)).  "[T]he plan confirmation process often involves significant costs that are avoided in the chapter 7 context.  In deciding whether a chapter 11 case should be converted . . . the court should consider whether liquidation in the chapter 11 case offers any advantages over liquidation in the chapter 7 context, and whether the added cost of the chapter 11 process is justified.'"  *Id.* at *3 (quoting 7 *Collier on Bankruptcy* ¶ 1112.04[5][b][ii]) (alterations in original); *see also Loop*, 379

---

[9]  HLC's declaration from Mr. Smallwood, its counsel in the Minnesota litigation with ResCap, is stunning.  Mr. Smallwood, purporting to state "facts" under penalty of perjury, in fact simply criticizes the holdings of the District Court and makes sworn statements improperly opining on the credibility of a witness at trial.  *See* Smallwood Decl., dated July 24, 2019, ¶ 23 (Dkt. No. 20).

F.3d at 518 ("Because . . . causes of action could be pursued by a trustee in Chapter 7 . . . no advantage would be gained by remaining in Chapter 11 . . . ."). *In re Red Door Lounge, Inc.*, 559 B.R. 728, 737 (Bankr. D. Mont. 2016) (finding conversion appropriate to avoid the "unnecessary and substantial costs and expenses related to the preparation of a disclosure statement and plan, approval of a disclosure statement, dissemination to creditors, solicitation, voting and participating in chapter 11 plan confirmation proceedings," and holding that "[i]n a chapter 7 case a trustee would eliminate all of those administrative burdens and expenses and would be able to investigate the Debtor's financial affairs and liquidate Debtor's assets").

In *Lennon*, the 9th Circuit BAP affirmed the bankruptcy court's conversion of a chapter 11 case to chapter 7 where there was "no indication that debtors' plan to liquidate the [largest] claim in chapter 11 offer[ed] any advantage over the trustee's plan to liquidate the claim . . . , particularly in light of the additional administrative expenses associated with a chapter 11 case." 2005 WL 6771262, at *3. Here, not only is there no valid justification for the typical expenses of a chapter 11, but indeed HLC has created a substantial, extra layer of expenses for duplicative professionals in an effort to create the appearance of independence. There is simply no need for HLC's gaggle of professionals, when the Bankruptcy Code contemplates a single independent fiduciary for these situations who can investigate avoidance actions and administer claims through the streamlined chapter 7 process. *See In re Picacho Hills Util. Co., Inc.*, 518 B.R. 75, 83–84 (Bankr. D.N.M. 2014) ("Conversion will allow a neutral, unbiased trustee to administer claims and investigate transfers without incurring the administrative costs associated with a Chapter 11 proceeding.").

HLC cannot defeat the showing of cause here by asserting that it has strong grounds to appeal ResCap's judgment against it. Putting aside whether HLC overstates its chances on appeal (it does), the hope and belief that it will prevail in litigation is simply not sufficient to defeat a showing of cause for conversion. *See In re BH S&B Holdings, LLC*, 439 B.R. 342, 350–51 (Bankr. S.D.N.Y. 2010) ("Case law is clear that the mere hope of prevailing on potential litigation claims is not a sufficient basis to defeat a showing of cause to convert."). And, in any event, a chapter 7 trustee is an independent fiduciary who can analyze the merits of the appeal free from self-interest or divided loyalties and determine the appropriate course of action for the estate. A trustee could consider

1    hiring HLC's existing trial counsel (subject to the requirements of Bankruptcy Code section 327),

2    or it could select new appellate counsel. A trustee would have a fresh perspective on the litigation,

3    one which might differ from the present approach that resulted in a $68 million adverse judgment,

4    plus millions of dollars in HLC's own attorneys' fees and expenses.

**2.      Cause Also Exists Because An Independent Fiduciary Is Needed To Pursue Estate Claims Against Insiders**

7          The costs of administration are not the only issue. A chapter 7 case would allow for an

8    independent fiduciary to investigate the substantial transfer HLC made to insiders without a conflict

9    of interest or the appearance thereof. This further supports conversion.[10] *See Picacho Hills*, 518

10   B.R. at 82 ("A number of courts have found 'cause' to convert or dismiss where the debtor in

11   possession has a conflict of interest in properly investigating and pursuing potential fraudulent

12   transfers."). Here, conversion of the case to chapter 7, and the resulting appointment of a trustee,

13   are "critical . . . to preserve the integrity of the bankruptcy process and to insure that the interests of

14   creditors are served." *See In re Suncruz Casinos, LLC*, 298 B.R 821, 828 (Bankr. S.D. Fla. 2003)

15   (quoting *In re Intercat Inc.*, 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000)).

16         The attempt by HLC and its insiders to build their own independent fiduciary machine is no

17   solution. The Bankruptcy Code contains detailed provisions regarding the qualifications,

18   disinterestedness, appointment, duties, and compensation of a trustee. *See, e.g.*, 11 U.S.C. §§ 321–

19   323, 326, 701–704, 1104 & 1106. HLC, LendingTree, and Mr. Lebda, however, have side-stepped

20   all of these. Rather than having an independent fiduciary appointed by the U.S. Trustee in

21   accordance with Bankruptcy Code section 701, they have hand-picked their own "independent"

22   fiduciary to investigate themselves. Nothing in the Bankruptcy Code authorizes this. Although the

23   Code permits chapter 11 debtors to remain in possession, 11 U.S.C. § 1107, the Code also sets

24   express limits on that through conversion (§ 1112) or the appointment of a trustee (§ 1104). Nothing

---

26   [10]  Section 1112(b) provides a list of examples of cause for conversion, but that list is not
     exhaustive. *See In re Lennon*, 2005 WL 6771262, at *2; *see also* 11 U.S.C. § 102(3) ("'includes'

27   and 'including' are not limiting"). Rather, a bankruptcy court "may consider other factors as
     they arise and use its powers to reach appropriate results in individual cases." *In re Lennon*,

28   2005 WL 6771262, at *2 (internal quotations and citations omitted).

12

in either sections 1112 or 1104 permits a debtor or its insiders to avoid these results by self-selecting their own pseudo trustee. *See In re Stratesec, Inc.*, 324 B.R. 158 (Bankr. D.D.C. 2004) (receiver for chapter 11 debtor corporation not appointed as responsible officer where proof did not exist that all creditors, among others, supported motion and one creditor objected); *see also In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 664–69 (Bankr. S.D.N.Y. 2006) (questioning court's authority under §1107 to appoint non-trustee fiduciary to act on behalf of the estate). A debtor and its insiders cannot create an alternative fiduciary position that the Code does not recognize in an attempt to evade the Code's express provisions. *See Law v. Siegel*, 571 U.S. 415, 421 (2014) (holding that "[i]t is hornbook law that § 105(a) does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code" (internal quotations omitted)).

The Bankruptcy Code's extensive provisions governing the appointment of independent fiduciaries serve a critical bankruptcy policy – that bankruptcy must be "fair in fact and in appearance as well." *In re Menk*, 241 B.R. 896, 909 n.4 (B.A.P. 9th Cir. 1999) (quoting H.Rep. No. 95–595 at 4 (1977), *U.S. Code Cong. & Admin. News* (1978) at 5963, 5965). Thus, "[t]he conduct of bankruptcy proceedings not only should be right but must seem right." *In re Ira Haupt & Co.*, 361 F.2d 164, 168 (2d Cir. 1966) (Friendly, J.). A profitable, NASDAQ -traded corporation taking a $40 million dividend from its subsidiary, leaving that subsidiary insolvent, and then picking the same people who will investigate that claim does not seem right (to say the least). Indeed, it is not right.

Debtors are not permitted to pick their own trustees or examiners, and for good reason. No matter how impartial that person may appear, he or she nonetheless owes the appointment to the parties being investigated. Regardless of the independent director's and CRO's qualifications, the inescapable fact is that any compensation, business connections, and other benefits of the positions ultimately result from their appointment by HLC. Here, not only will DSI and Arch & Beam receive substantial, direct compensation, but they also have had the opportunity to direct significant business to numerous other professional firms. Even assuming the independent director and CRO commenced an investigation, "[n]o matter how thoroughly or fairly [they] conducted the investigation, the question will always linger whether [they] held back, or failed to bite the hand

13

Case: 19-51455    Doc# 41    Filed: 07/31/19    Entered: 07/31/19 18:46:26    Page 18 of
26
MOTION TO CONVERT CASE TO CHAPTER 7

that feeds [them] quite as hard as the circumstances warranted." *In re Sunbum5 Enters., LLC*, 2011 WL 4529648, at *25 (M.D. Fla. Sept. 30, 2011) (quoting *In re Granite Partners, L.P.*, 219 B.R. 22, 38 (Bankr. S.D.N.Y. 1998)). A chapter 7 trustee is statutorily required to conduct an investigation and would not be burdened by any questions about allegiance to HLC's former management and LendingTree, the very parties who are being investigated. "If someone must be hired to report to the Court, the United States Trustee rather than the Debtor should select the new fiduciary. And unlike the Debtor's employees, the trustee will be bonded for the faithful performance of his or her duties." *In re Euro-American Lodging Corp.*, 365 B.R. 421, 432 (Bankr. S.D.N.Y. 2007).

Moreover, HLC admits that "settlement negotiations are ongoing" regarding the claims against LendingTree and Mr. Lebda. English Decl. ¶ 11. Thus, not only did LendingTree and Mr. Lebda select their own investigators, they selected their own counterparties to negotiations. Their goal is not only to evade scrutiny by a trustee, but to avoid being sued altogether. By setting up the process for a "settlement" that would be subject to approval under Bankruptcy Rule 9019, LendingTree and Mr. Lebda are trying to turn $40 million in liability into a settlement subject only to "reasonableness" review. Although an independent fiduciary ultimately might negotiate a settlement with HLC's insiders, it would do so without the insider dealings that tarnish the current process.

An independent chapter 7 trustee also would have incentives that would naturally align with HLC's creditors:

> [A]n independent Chapter 7 trustee, whose compensation is not fixed but which is related to the value of assets recovered for the estate and the amount disbursed to creditors, has the strongest incentive to discover and recover preferential transfers and fraudulent conveyances and to obtain the best possible price for debtor's assets. And, because the trustee is generally not compensated until all distributions are made, he has the incentive to expedite conclusion of a case.

*In re Mid Pac. Airlines, Inc.*, 110 B.R. 489, 492 (Bankr. D. Haw. 1990).

An independent trustee might also investigate and discover other potential claims against insiders and others. Although HLC has recently decided to disclose the $40 million dividend as something that should be investigated, it has said nothing about other intercompany claims between HLC and LendingTree, or whether any of the substantial payments made to professionals during the

past 90 days might constitute preferences. *See, e.g.*, *In re SONICblue, Inc.*, 422 B.R. 204, 212 (Bankr. N.D. Cal. 2009) (chapter 11 trustee discovered that debtor's counsel had received unreported preferences). HLC also has said nothing about the way in which it was operated by LendingTree and whether that activity gives rise to creditors' rights to pursue LendingTree directly under applicable law.

Moreover, the involvement of the U.S. Trustee in the selection of a trustee ensures that interests beyond those of the debtor and its insiders are being addressed and protected. Congress has entrusted the U.S. Trustee with the authority to select independent fiduciaries with only one purpose in mind – to fulfill the requirements of the Bankruptcy Code. The limited – and only – exception to that is that creditors may sometimes elect a trustee. But in either case, the trustee must be selected in accordance with the Bankruptcy Code's provisions, and subject to the Code's requirements. Nothing in the Code permits a debtor or its insiders to select a trustee.

As held by the Third Circuit in affirming the appointment of a chapter 11 trustee:

> The willingness of Congress to leave a debtor-in-possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee. And if the debtor-in-possession defaults in this respect, Section 1104(a)(1) commands that the stewardship of the reorganization effort must be turned over to an ***independent trustee***.

*See In re Marvel Entm't Grp.*, 140 F.3d 463, 474 (3d Cir. 1998) (quoting *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989) (emphasis added)). Congress provided only two ways to replace a debtor's management with an independent fiduciary: appointment of a trustee pursuant to 11 U.S.C. § 1104(a), or conversion of a case to chapter 7 under 11 U.S.C. § 1112, which is what is mandated here.

While bankruptcy courts may take into account changes in a debtor's management team in determining whether to order the appointment of a trustee, last-minute management changes designed to fend off a trustee appointment are insufficient. *See, e.g.*, *In re Microwave Prods. of Am.*, 102 B.R. 666, 676 (Bankr. W.D. Tenn. 1989). Here, HLC sold its business in 2012, and appears to have completed much of its wind-down by 2015. The most significant events since then have been the $40 million dividend to LendingTree and ResCap's $68 million judgment. It was only in February of this year that Mr. Lebda replaced himself with Mr. Everett as HLC's sole director, by

which time HLC and LendingTree already had been planning this bankruptcy for months. Both Pachulski and Arch & Beam were hired no later than July 2018. Thus, without question, the installation of "independent management" was calculated specifically with this bankruptcy case in mind, and to attempt to avoid the Bankruptcy Code's provisions governing the appointment of trustees. HLC, LendingTree, and Mr. Lebda effectively chose their own "trustee," without any consultation with creditors, and before creditors could seek the appointment of a trustee or conversion pursuant to Bankruptcy Code sections 1104 and 1112.

To be sure, "independent directors" and "special committees" have been present in chapter 11 cases. Judge Glenn appointed an independent CRO in RFC's case – with the affirmative support of creditors – to participate in the negotiation of certain claims against the estate and a plan. *See In re Residential Capital, LLC*, 497 B.R. 720, 726 (Bankr. S.D.N.Y. 2013). But in many chapter 11 cases, keeping the debtor's existing management in possession also serves a critical role, such as preserving the value of an operating business for rehabilitation or sale. Here, by contrast, there is no operating business, and no assets to speak of other than insider litigation claims and cash. Thus, the rationale underlying having an independent director – to permit the debtor to remain in possession while a specific issue is investigated – simply does not apply here. And even in the best of cases, independent directors and special committees raise significant concerns. As written by lawyers from one of HLC's own four law firms:

> ***In an effort to short-circuit the investigation process*** and deprive creditors' committees of critical leverage, debtors are increasingly turning to internal investigations of their insiders conducted by nominally independent special committees of their boards of directors. ***In many cases, these special committee investigations are designed to pre-empt the ability of creditors' committees to investigate or pursue insider claims***.
>
> ***
>
> In an apparent response to the successful pursuit of insider litigation by creditors' committees, debtors have utilized special committees in an attempt to control the investigation process. ***Although these special committees are ostensibly composed of independent directors, many debtors retain professional directors who may not be truly independent.***
>
> Special committee investigations typically commence shortly before the filing of the bankruptcy case and are highlighted in a debtor's first day declaration. The special committee investigations continue after the petition date and may culminate in a public report concluding that litigation should not be instituted and

16.

recommending that the estate grant releases to insiders.  The special committee may also negotiate and seek approval of a settlement with the insiders without consulting the creditors' committee.

***

Accordingly***, there is a significant risk that the special committee may reach a below-market settlement or discount valuable insider litigation***.  Because the special committee's decision to settle litigation is governed by the generous standards of Bankruptcy Rule 9019, it is possible that a special committee could decide that, although actionable litigation exists, the costs of the litigation outweigh any benefits to the estate.  While it may be rare that a special committee counsels against the pursuit of valuable insider litigation, ***the applicable legal standard allows a special committee to settle claims for pennies on the dollar so long as the settlement falls within the lowest range of reasonableness***.

Jay R. Indyke et al., *Are The Foxes Guarding The Henhouse?*, Turnaround Management Association (June 2019) (emphasis added) (footnotes omitted).[11]  These concerns are all present here – LendingTree and Mr. Labda retained professionals to serve as the independent director and CRO, they commenced their investigation shortly before the bankruptcy filing, and they have engaged in settlement negotiations without informing creditors.  It is thus not surprising that one of HLC's law firms wrote this article a month ago – they are following their own script in this case.

Allowing HLC and its insiders to rely on their engagement of a CRO and independent director under these circumstances would nullify the Bankruptcy Code's express provisions for appointment of an independent fiduciary, and enable any debtor in possession to avoid being dispossessed by selecting its own quasi-trustee under the guise of a CRO or independent director.  It would also encourage future debtors to respond in the same manner to any motion or anticipated motion for appointment of a trustee, effectively writing sections 1104(a) and 1112 out of the Bankruptcy Code.  This is especially problematic where, as here, the parties selecting the "new management" are the same ones who authorized and received a $40 million "dividend" long after HLC ceased doing business and was subject to more than $100 million in claims by ResCap, Lehman, and other creditors.

---

[11]     *https://turnaround.org/jcr/2019/06/are-foxes-guarding-henhouse*.

MOTION TO CONVERT CASE TO CHAPTER 7

**3. Cause Also Exists Because HLC's Chapter 11 Filing Is Not In Good Faith**

A lack of good faith in filing a bankruptcy case also establishes cause for conversion. *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir.1994) ("Although section 1112(b) does not expressly require that cases be filed in 'good faith,' courts have overwhelmingly held that a lack of good faith in filing a Chapter 11 petition establishes cause for dismissal."). Although HLC may have had reasons to seek bankruptcy protection, the manner in which it and its insiders proceeded lacks good faith.

As just described, the retention of nine different professionals by HLC and its insiders to try to forestall the proper appointment of an independent fiduciary under the Bankruptcy Code lacks good faith. That is further demonstrated by the year of planning and uncontained spending by HLC and its insiders in preparation for filing this case in a manner designed to keep control over the investigation and "settlement" of insider claims.

HLC's choice of venue is also indicative of a lack of good faith. *See In re Univ. Commons, L.P.*, 204 B.R. 80, 82 (Bankr. M.D. Fla. 1996) ("It is not unreasonable to conclude that the Debtor's choice of venue was made in bad faith considering that the subject property is located in Florida, its primary antagonist is a Florida Bank, and the majority, if not all its unsecured creditors, save the insiders, are residents of Florida."); *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1395 (11th Cir. 1988) ("Although perhaps technically proper, the choice to file the petition so far from where the property and creditors are located may itself be evidence of bad faith.").

For nearly a decade (and perhaps longer), HLC's headquarters has been in North Carolina, where LendingTree is also headquartered, and where Mr. Lebda resides.[12] It has no assets in California, and no business operations to speak of anywhere. Its only connection to the Northern District of California is its state of incorporation, and the fact that most of its bankruptcy professionals are centered there, including those from Pachulski, Arch & Beam, and DSI. Indeed,

---

[12] *See* Congressman Sues LendingTree CEO Over Home Construction In Quail Hollow, Charlotte Business Journal, June 13, 2018 (available at https://www.bizjournals.com/charlotte/news/2018/06/13/congressman-sues-lendingtree-ceo-over-home.html).

HLC's mailing address, the basis upon which this case was assigned to the San Jose Division, is a UPS store "street address" that does not actually exist, and is instead just a post office box that is used by Arch & Beam and its related entities.[13] Moreover, HLC's three biggest scheduled creditors, ResCap, Lehman, and JPMorgan are centered in New York and Minnesota, not in California. The trial and pending appeal between ResCap and HLC is pending in Minnesota, and the pending litigation by Lehman against HLC is in New York. This bankruptcy case was filed thousands of miles away from HLCs creditors and the ongoing litigation with those creditors, and thousands of miles from the insiders who are targets of claims that make up the estate's biggest asset.

### 4. Cause Also Exists Because Creditors Support Conversion

HLC's two largest creditors by far are ResCap and Lehman, both of which support conversion of this case. ResCap and Lehman do not have confidence in HLC's ability to properly administer the estate and maximize value for creditors. *In re McClure*, 2016 WL 3769094, at *9 (Bankr. C.D. Cal. July 12, 2016) (citing as basis for conversion, the creditors' lack of confidence in the debtor).

### B. There Are No Unusual Circumstances That Support Denial Of Conversion

Because cause exists for conversion, HLC must establish "unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate" to avoid conversion of the case. 11 U.S.C. § 1112(b)(2). No such circumstances exist here.

The only unusual circumstances here are those discussed in this motion – that LendingTree and Mr. Lebda have concocted a scheme where the bankruptcy process will be used to investigate their own misconduct. They and their handpicked "independent" management have retained no fewer than nine professionals and burned through millions of dollars in cash without so much as

---

[13] For example, Arch & Beam used the address for a General Assignment for the Benefit of Creditors of Leap Motion, Inc. *See* https://arch-beam.com/lmi, last visited on July 28, 2019. The UPS store actually located at the street address, 7 W. 41st Ave, San Mateo, CA 94403, advertises that a private mailbox there "comes with a real street address, which provides a more professional and established image . . . ." *https://locations.theupsstore.com/ca/san-mateo/7-w-41st-ave/mailbox-services,* last visited on July 28, 2019.

even seeking the views of creditors before they did so.  There is no justification for their conduct, or to allow that conduct to continue at the expense of creditors.

**C.     Conversion Is In The Best Interests Of Creditors**

The final step under section 1112(b) is for the Court to determine whether conversion, dismissal, or appointment of a chapter 11 trustee is in the best interests of creditors.  *See* 11 U.S.C. § 1112(b)(1); *In re Green*, 2016 WL 6699311, at *7 (B.A.P. 9th Cir. Nov. 9, 2016).  Although ResCap would not oppose outright dismissal, it believes that of utmost importance is the appointment of a truly independent trustee.  As between a chapter 7 trustee or a chapter 11 trustee, a chapter 7 trustee is preferable, because there is no need for the additional expense associated with chapter 11.  *See supra* pp. 9–11 (citing *In re Lennon*, 2005 WL 6771262, at *4).  There is nothing to reorganize or rehabilitate, there is no need for the disclosure statement and plan process, and assuming a trustee is appointed, there is no need for a creditors' committee.  As one bankruptcy court aptly held:

> Conversion will best serve creditors because more creditors will be paid more money more quickly if a neutral trustee is installed.  The trustee can take control of what little remains of the debtors' property and can liquidate it with the interests of the creditors rather than the debtors in mind.  He can also evaluate dispassionately the merits of the debtors' many claims, including the claims currently in litigation, and can pursue only those claims that have merit, putting the rest to a merciful end.  For the same reasons, conversion is in the best interest of the estate.  Administrative costs will be reduced with a chapter 7 trustee in place, and the value of the estate will be greater.

*In re Rey*, 2006 WL 2457435, at *9 (Bankr. N.D. Ill. Aug. 21, 2006).

Accordingly, HLC's two largest creditors – ResCap and Lehman – support conversion.  *In re Babayoff*, 445 B.R. 64, 82 (Bankr. E.D.N.Y. 2011) (granting motion to convert and noting "where a majority of creditors favor one result over the other, the consensus of a majority of creditors is another factor which may guide the court in determining what is in their best interests" (internal quotations and alteration omitted)).

**CONCLUSION**

ResCap respectfully requests that the Court grant its motion to convert this case to one under chapter 7, and such other relief that is just and proper.

Case: 19-51455   Doc# 41   Filed: 07/31/19   Entered: 07/31/19 18:46:26   Page 25 of 26

MOTION TO CONVERT CASE TO CHAPTER 7

Dated:  July 31, 2019

*/s/ K. John Shaffer*

Susheel Kirpalani (Pro Hac Vice pending)
QUINN EMANUEL URQUHART & SULLIVAN,
LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100
Email:  susheelkirpalani@quinnemanuel.com

K. John Shaffer (Cal. Bar No. 153729)
Matthew R. Scheck (Cal. Bar. No. 273152)
QUINN EMANUEL URQUHART & SULLIVAN,
LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017
Telephone:  (213) 443-3000
Facsimile:  (213) 443-3100
Email:  johnshaffer@quinnemanuel.com
           matthewscheck@quinnemanuel.com

Stephen Finestone (Cal. Bar No. 125675)
Jennifer C. Hayes (Cal. Bar No. 197252)
FINESTONE HAYES LLP
456 Montgomery Street, 20th Floor
San Francisco, California 94104
Telephone:  (415) 616-0466
Facsimile:  (415) 398-2820
Email:  jhayes@fhlawllp.com