Stephen Finestone (Cal. Bar. No. 125675)
Jennifer C. Hayes (Cal. Bar No. 197252)
FINESTONE HAYES LLP
456 Montgomery Street, 20th Floor
San Francisco, California 94104
Telephone: (415) 616-0466
Facsimile: (415) 398-2820
Email: sfinestone@fhlawllp.com
       jhayes@fhlawllp.com

[additional counsel listed on signature page]

*Attorneys for the ResCap Liquidating Trust*

Michael Malter, Esq. (SBN 96533)
Robert G. Harris, Esq. (SBN 124678)
BINDER & MALTER, LLP
2775 Park Avenue
Santa Clara, CA 95050
T: (408) 295-1700
F: (408) 295-1531
Email: michael@bindermalter.com
Email: rob@bindermalter.com

[additional counsel listed on signature page]

*Attorneys for Lehman Brothers Holdings, Inc.*

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| In re:<br><br>HOME LOAN CENTER, INC.,<br><br>Debtor. | Case No. 19-51455 (MEH)<br><br>Chapter 11<br><br>**CREDITORS' JOINT RESPONSE TO DEBTOR'S STATUS CONFERENCE STATEMENT**<br><br>Date: August 29, 2019<br>Time: 10:30 a.m.<br>Place: Courtroom 3020<br>         280 South First Street<br>         San Jose, CA 95113<br>Judge: Hon. M. Elaine Hammond |

ResCap Liquidating Trust ("ResCap") and Lehman Brothers Holdings, Inc. ("LBHI," and with ResCap, the "Creditors") jointly respond to the Status Conference Statement [Doc. No. 69] filed by Home Loan Center, Inc. ("HLC") as follows:

As set forth in ResCap's Motion To Convert Case To Chapter 7 [Doc. No. 41] and LBHI's Joinder [Doc. No. 66], HLC does not belong in chapter 11. HLC sold all of its operating assets in 2012, and it has been "winding down" its operations for more than seven years. It has no employees and no material assets other than cash and claims against its insiders. Nor does HLC have any hope – or even pretense – of reorganizing. As set forth in HLC's own Initial Debtor Interview Checklist & Certifications for the Office of the United States Trustee:

> … this case was commenced in order to permit HLC to prosecute an appeal of the RFC Judgment without threat of execution on its assets. At the same time, HLC intends to use the bankruptcy process to liquidate all other claims in an efficient, cost-effective and streamlined manner and distribute available cash to creditors according to the priority set forth in the Bankruptcy Code.

*See* Exhibit A, Question 2.

The only "efficient, cost-effective and streamlined manner" by which to resolve this case is chapter 7, under the direction of a truly independent trustee appointed in accordance with the Bankruptcy Code, who can objectively and impartially liquidate the remaining estate assets and distribute proceeds to creditors in accordance with Bankruptcy Code section 726.

Conversion to chapter 7 is supported by ResCap and LBHI, who together hold nearly $109 million of the approximately $112 million in claims scheduled by HLC in this case. ResCap's claim is based upon a jury verdict and subsequent judgment in the U.S. District Court for the District of Minnesota, which resulted from HLC's pervasive practices of originating bad loans while under the direction of LendingTree and its other corporate insiders. LBHI was pursuing similar claims in the U.S. Bankruptcy Court for the Southern District of New York, until that action was stayed by HLC's bankruptcy filing.

Since the time that the conversion motion was filed, additional facts have come to light that further support conversion of this case to chapter 7. ResCap is in the process of reviewing documents it has received through discovery, but some of the significant revelations to date include:

**1. LendingTree's Undisclosed Co-Liability For HLC's Debts**

HLC's Schedule H [Doc. No. 16] states that HLC has no co-debtors, and that there are no other entities that are liable for any of its debt, nor any guarantors or co-obligors. This is false for at least two reasons.

*First*, as discussed further below, LendingTree guaranteed at least one of HLC's professionals' fees, Williams & Connolly.

*Second*, in 2008 (after HLC had sold all of its defective loans to ResCap and LBHI), LendingTree, Inc. agreed to assume liability for HLC's obligations, including HLC's obligations to ResCap and LBHI. As stated in a Form S-1 filed by LendingTree, Inc. (then "Tree.com") in August, 2008, LendingTree agreed to "assume all of the liabilities related to the Tree.com Businesses," which was the "LendingTree Loans" business conducted by HLC.[1] The underlying documents confirm this, and on this basis ResCap has commenced an action against LendingTree, Inc. in the U.S. District Court for the District of Minnesota, which action also includes alter ego claims under California law against both LendingTree, Inc. and its subsidiary, LendingTree, LLC. *See ResCap Liquidating Trust v. LendingTree, LLC & LendingTree, Inc.*, Case No. 19-cv-02360 (D. Minn.).

HLC's failure to disclose either of these co-debtor relations with LendingTree is inexcusable, and *at best* shows that HLC is in no position to investigate its parent LendingTree.

**2. Other Undisclosed Insider Relationships And Preferences**

*Arch + Beam*

Arch + Beam and its principal, Mr. English, are serving as the "independent" Chief Restructuring Officer in this case – notwithstanding the fact that HLC is not "restructuring." Mr. English's duties include investigating claims against LendingTree and other HLC insiders. *See* Debtor's Motion For Relief From The Automatic Stay … [Doc. No. 17 at 4] ("The Debtor, through its Independent Manager *and CRO*, has spent substantial time and resources analyzing the Debtor's claims" against LendingTree and other insiders (emphasis added)). But, buried 31 pages into Arch

---

[1] *See* Form S-1 filed August 1, 2008, at F-32; *see also id.* at 58 (available at https://www.sec.gov/Archives/edgar/data/1434621/000104746908008622/a2187113zs-1.htm ).

+ Beam's motion to be employed pursuant to the so-called "Jay Alix Protocol" (and thus avoid the requirements of Bankruptcy Code sections 327 & 330)[2] is the admission that Mr. English's spouse is employed as an attorney by LendingTree's counsel, Sheppard Mullin. *See* Declaration Of Matthew English … [Doc. No. 37, Ex. B] at ¶ 21. Even more concerning, however, is Mr. English's admission at the 341 meeting of creditors on August 22 that it was Sheppard Mullin who first contacted Arch + Beam about being employed by HLC in this case, and indeed Arch + Beam worked for HLC for nearly 17 months while it was fully controlled by LendingTree and its officers and directors.[3] Only then did Mr. English become the "independent" CRO, just a few months before this bankruptcy case was filed.

Sheppard is ***counsel for LendingTree in this case***. Moreover, Sheppard was counsel at the time HLC's business was sold to Discover (and listed as the notice party for HLC in those documents), and when at least $40 million of the proceeds of that sale were upstreamed to LendingTree. This conflict may disqualify Arch + Beam entirely from this case, and it certainly disqualifies Arch + Beam from being HLC's "independent" management entrusted with investigating claims against LendingTree. The appearance – if not fact – of conflict is too great. Mr. English cannot independently investigate claims of parties represented by the very law firm that brought him into the case (and by which his spouse is employed).

***Williams & Connolly***

HLC has filed an application to employ Williams & Connolly as "special litigation counsel." [Doc. No. 33]. HLC failed to disclose, however, that its parent LendingTree guaranteed (and is continuing to guarantee) all of Williams & Connolly's fees.

---

[2] The Creditors intend to object to Arch + Beam's "Jay Alix Protocol" motion, not only because of the conflicts described herein, but also because there is no justification for Arch + Beam's evasion of the Bankruptcy Code's requirements for professional employment and compensation. Whatever justification the "Jay Alix Protocol" may (or may not) have in large, operating chapter 11 cases, the protocol is inappropriate here where the debtor has no operations, no employees, no material assets other than cash and litigation claims, and no prospects for a "reorganization." The Creditors also intend to object to all of HLC's pending motions and applications on the grounds that any relief affecting the estate should be first considered by an independent, duly appointed trustee.

[3] ResCap has requested the tape of the 341 meeting on an expedited basis, and will have it transcribed as soon as possible after it is received.

This is a significant, undisclosed conflict, not only because of the direct financial relationship between Williams & Connolly and LendingTree, but also because it signals the likely existence of another significant estate claim against LendingTree (one not identified by Mr. English or anyone else at Arch + Beam). LendingTree is likely liable to the estate for millions of dollars in preferential transfers – a claim that HLC does not appear to have disclosed in its Schedules, the Williams & Connolly application, or otherwise.

Preferential payments to *or for the benefit of* an insider are recoverable if made within the year before bankruptcy. 11 U.S.C. §§ 547(b), 550(a)(1). As the 100% equity owner of HLC, LendingTree is an "insider." As guarantor of Williams & Connolly's fees, Lending Tree benefitted from payments to Williams & Connolly, not only because of its concerns about liability for the underlying claims, but also because it was "off the hook" every time HLC paid a bill. *See Levit v. Ingersoll Rand Financial Corp. (In re Deprizio)*, 874 F.2d 1186 (7th Cir. 1989) (guarantor is a beneficiary of debtor's payments of guaranteed debt for preference purposes); *Official Unsecured Creditors Comm. of Sufolla, Inc. v. U.S. Nat'l Bank of Or. (In re Sufolla, Inc.)*, 2 F.3d 977, 986 (9th Cir. 1993) (same).[4] Although HLC may have been careful in avoiding preferential payments to Williams & Connolly within the 90 days before bankruptcy (although no analysis appears to have been done), HLC was not careful within the one-year lookback period before bankruptcy. Indeed, it appears that Williams & Connolly was at times millions of dollars and months behind in receiving payment. LendingTree is liable for those catch-up payments (and perhaps far more) under Bankruptcy Code section 550.

### 3. Unfiled Employment Applications

HLC's Schedules list *eight* professional firms holding retainers or "prepaid fees" exceeding $1.7 million.[5] Yet, more than a month into this case, HLC has only filed *two* employment

---

[4] Although Congress has limited the reach of *Deprizio* to **non-insider** guarantors, *see* 11 U.S.C. §§ 547(i), 550(c), LendingTree is an insider, and thus remains subject to the rule. LendingTree is also a creditor because it was scheduled by HLC as being owed approximately $32,000.

[5] HLC also made payments to at least *three additional* professional firms during the six months before bankruptcy.

applications (three, if one counts Arch + Beam's "Jay Alix Protocol" motion). As to the other five, HLC has refused to disclose whether it does, or does not, intend to file employment applications, including at the 341 meeting. Indeed, in response to ResCap's repeated inquires on this subject, HLC's counsel replied "***Why do I have to tell you who is employed and who is not employed?***" *See* Exhibit B. This is the antithesis of the policies of transparency and disclosure that underlie the Bankruptcy Code and the responsibilities of a debtor in possession in any chapter 11 case. Yet this is not just any chapter 11 case – this is a liquidation where the principal assets are claims based on improper insider transactions. Moreover, the professionals about whom ResCap was inquiring – particularly FTI and Katten Muchin – are purportedly at the center of the investigation of those claims:

> 10. The Debtor's management has spent substantial time and resources analyzing the Debtor's claims identified above. In addition to restructuring counsel, the Debtor retained FTI Consulting, Inc. and Katten Muchin Rosenman LLP to assist the Debtor in connection with such analysis.

*See* Declaration Of Matthew English … [Doc. No. 19] at ¶ 10.

### 4. The Incredible Cash Burn

Per HLC's own internal financial statements, it had in excess of $70 million in cash at the beginning of 2016. Now it has less than $6 million. The largest chunk of that money went to LendingTree – at least $40 million. The rest appears to have gone almost entirely to professional firms, including Williams & Connolly and the other professionals now employed in this case. This consumption of more than $60 million in three years is stunning by any measure, and far more so in a case where the debtor ceased business operations in 2012. Indeed, in just the 90 days prior to the petition date, HLC transferred more than $5 million to its professionals. HLC's own internal projections, which ResCap obtained through discovery, show more than $2 million in additional funds being spent by the end of this year.

HLC should have honored its obligations to creditors – ResCap, Lehman, and others (if any). Had it done so, the $70 million it had three years ago, while still leaving HLC insolvent, would nonetheless have gone a long way toward making creditors whole. Instead, HLC paid nearly all of

5

Case: 19-51455    Doc# 75    Filed: 08/27/19    Entered: 08/27/19 16:18:05    Page 6 of 9

CREDITORS' JOINT RESPONSE TO DEBTOR'S STATUS CONFERENCE STATEMENT

its money to insiders and professionals, and now wants to control a chapter 11 process that will cost even more money, is unnecessary, and is inherently conflicted.

### 5. The "Settlement"

On the afternoon of Friday, August 23, HLC informed ResCap and LBHI that it had reached a $31 million "settlement" with LendingTree. HLC insisted that ResCap and LBHI provide their thoughts on the settlement by close of business Monday, August 26. It did so even though HLC has refused to produce in discovery its underlying analysis of the claims. Moreover, HLC categorically refused at the 341 meeting to answer any substantive questions regarding the transfers to LendingTree, any other claims against LendingTree or other insiders, the investigation of those claims, or any settlement negotiations relating to those claims. HLC failed to disclose any of this, even though the 341 meeting concluded less than 24 hours before it informed ResCap and LBHI that it had already reached a "settlement."

On Sunday, August 25, ResCap and LBHI jointly requested additional information regarding the "settlement," including further explanation and confirmation of its terms, and HLC's providing of the basis for its assertion that the "settlement" was in the best interests of the estate. In response, the Creditors learned that there was no documentation – not even a term sheet. Indeed, LendingTree had in fact not committed to any settlement until it knew the Creditors' position (including, it appears, whether they would abandon the conversion motion). HLC also refused to provide the underlying analysis for its decision, stating that Mr. English would set forth HLC's reasons for entering into the "settlement" in a declaration of Mr. English to be filed with a settlement motion. It was also clear from HLC's response that HLC had not investigated all of the potential claims against HLC before reaching the "settlement," including the preferential payments of Williams & Connolly's invoices.

HLC's attempt to cram a half-baked, insider settlement down on creditors is entirely inappropriate. HLC should not have been, and should not be, investigating these claims, or settling them. They should be investigated by an independent trustee, with the full input of, and consultation with, the real parties in interest in this case – HLC's creditors.

HLC's purported "settlement" with LendingTree should not be approved. Regardless of its merits (which the Creditors seriously doubt), the conflicted process and total lack of creditor involvement is wholly improper. To the extent HLC attempts to have a Rule 9019 motion to approve the "settlement" heard at or before the hearing on the conversion motion, the Creditors will seek a stay of such motion until a trustee is appointed.

Dated: August 27, 2019

/s/ K. John Shaffer

Susheel Kirpalani (Admitted Pro Hac Vice)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
Email: susheelkirpalani@quinnemanuel.com

K. John Shaffer (Cal. Bar No. 153729)
Matthew R. Scheck (Cal. Bar. No. 273152)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
Email: johnshaffer@quinnemanuel.com
       matthewscheck@quinnemanuel.com

Stephen Finestone (Cal. Bar No. 125675)
Jennifer C. Hayes (Cal. Bar No. 197252)
FINESTONE HAYES LLP
456 Montgomery Street, 20th Floor
San Francisco, California 94104
Telephone: (415) 616-0466
Facsimile: (415) 398-2820
Email: sfinestone@fhlawllp.com
       jhayes@fhlawllp.com

*Attorneys for the ResCap Liquidating Trust*

Brad J. Axelrod, Esq. (NYSBN 2287795)
Mara R. Leiber, Esq. (NYSBN 5321310)
WOLLMUTH, MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Tel: 212-382-3300
Fax: 212-382-0050

| | |
|---|---|
| 1 | Mobile: 225-636-1516 |
| 2 | Email: BAxelrod@wmd-law.com |
| 3 | |
| 4 | Michael Malter, Esq. (SBN 96533) |
| | Robert G. Harris, Esq. (SBN 124678) |
| 5 | BINDER & MALTER, LLP |
| | 2775 Park Avenue |
| 6 | Santa Clara, CA 95050 |
| | T: (408) 295-1700 |
| 7 | F: (408) 295-1531 |
| | Email: michael@bindermalter.com |
| 8 | Email: rob@bindermalter.com |
| 9 | *Attorneys for Lehman Brothers Holdings, Inc.* |